Filed 2/10/22  In re Leeann T. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
### SECOND APPELLATE DISTRICT
### DIVISION THREE

| | |
|---|---|
| In re LEEANN T., a Person Coming Under the Juvenile Court Law. | B311593 |
| _____ | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 20CCJP06584A) |
| Plaintiff and Respondent, | |
| v. | |
| MICHAEL T., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Nichelle L. Blackwell, Commissioner.  Affirmed.

Anne E. Fragasso, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel for Plaintiff and Respondent.

Michael T. (father) challenges the juvenile court's jurisdiction and disposition orders as to his infant daughter, Leeann T. Father contends the juvenile court erred by (1) finding that father's conduct created a risk of harm to Leeann, (2) removing Leeann from father's custody, and (3) ordering father to drug test. We find no error, and thus we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.      *Leeann's Positive Drug Test at Birth; DCFS's Involvement With the Family*

Leeann came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) when she and her mother, Melissa H. (mother), tested positive for opiates and methadone at Leeann's birth in November 2020.[1] The hospital confirmed mother's positive test two days later, but it was unable to retest Leeann because father refused to consent. A hospital nurse reported that Leeann had been jittery and was not eating much.

Mother's medical records indicated that she had been seen for prenatal care only twice, and she had tested positive for marijuana, methadone, and opiates on September 30.

Father told a children's social worker (CSW) that mother previously had "dabbled" with drugs but had stopped using when she found out she was pregnant. Mother was receiving methadone through a drug treatment clinic, but father would not disclose what kinds of drugs mother had used in the past or say whether he used drugs or had a criminal history. Father said he would drug test only if ordered to do so by a court, and he refused

---

[1] All subsequent dates are in 2020 unless otherwise indicated.

2

to sign a safety plan, although he said he would do what the plan required. Father also declined to allow the CSW to conduct a home visit prior to discharge, and said he would make a "civilian arrest" if anyone kept him from bringing his child home.

The CSW attempted to speak to mother in the hospital but was prevented from doing so by father, who came out of mother's hospital room, told the CSW to walk outside with him, and said mother could not speak to the CSW because she had just taken a Norco. The hospital social worker, too, had been unable to interview mother because father insisted on being present and then did not allow mother to speak freely. The hospital social worker said father frequently talked over others and felt he could speak on behalf of mother and child, as well as himself. Father said he had retained an attorney and would be suing the hospital and DCFS.

A CSW finally interviewed mother in early December, after her discharge from the hospital.[2] Mother said she found out she was pregnant in May, but she would not say when she began going to the drug clinic. Mother said she was willing to drug test and would enter an inpatient drug program if necessary. She was unwilling to disclose what drugs she used or if she had a criminal record.

On December 7, DCFS offered to allow the parents to consent to a non-detained petition. On December 9, father said he would not consent to a non-detained petition and would

---

[2] The detention report states that the interview took place on December 21, but that date appears to be in error because the report was filed on December 14. It seems likely that the interview occurred on December 1 or 2.

" 'leave the county' " if DCFS attempted to remove Leeann from him.

### B.   *Detention and Petition*

The juvenile court issued an expedited removal order on December 10.  However, when DCFS went to the family's home to serve the order, father said mother and Leeann were in Riverside County, and he refused to provide any information about their whereabouts, calling the CSW a " 'domestic terrorist.' "  Later that day, DCFS received an anonymous tip that mother and Leeann had been seen outside the family's residence.  DCFS returned to the home later the same evening; father again exited the home and said mother was in Murrieta and the child was in Riverside with the maternal grandmother.  Father again refused to disclose Leeann's whereabouts.

DCFS filed a juvenile dependency petition pursuant to Welfare and Institutions Code[3] section 300, subdivision (b) on December 14, 2020.  It alleged that (1) Leeann had a positive toxicology screen for opiates and methadone at birth as a result of mother's substance use (count b-1), and (2) mother had a history of substance abuse which rendered her unable to care for the child, and father failed to protect Leeann because he knew of mother's substance abuse and allowed her to live in the family home and have unlimited access to the child (count b-2).

Both parents appeared telephonically at the December 17 detention hearing.  Mother's counsel began by saying that Leeann was with mother, for whom counsel could provide an address.  Counsel said mother "[had not been] aware of the

---

[3]   All subsequent statutory references are to the Welfare and Institutions Code.

4

proceedings when the Department attempted to pick up the child," but that mother now was "perfectly willing to bring the child in or have the Department pick up the child." Father gave a different account of Leeann's whereabouts: He said that since the family left the hospital, Leeann had been staying with his mother (the paternal grandmother) and he had been visiting her daily.

The court noted the discrepancy between mother's and father's statements and asked mother again where Leeann was at present. Mother said the child had been staying with both the maternal grandfather and paternal grandmother, but currently she was with the paternal grandmother. The court then directed a court officer to call the paternal grandmother, who said Leeann was not with her.[4] The court officer also called the maternal grandfather, who did not know where Leeann was and said he had not seen her since a few days after her birth.

Based on this information, the court made a finding that the parents had absconded with Leeann and were not being truthful with the court. It ordered Leeann detained from both parents, issued a protective custody warrant for the child, and issued arrest warrants for the parents. It further ordered mother to participate in a substance abuse rehabilitation program, weekly random drug testing, parenting classes, and individual counseling, and ordered father to participate in weekly random drug testing, a parenting class, and individual counseling.

---

[4] The paternal grandmother subsequently told the CSW that she had seen pictures of Leeann, but had never met her.

*C.     Placement of Leeann in Foster Care*

On January 14, 2021, nearly a month after the court issued the protective custody warrant for Leeann, sheriff's deputies made a visit to the family's home during the night. Leeann was recovered and placed in foster care.

*D.     Jurisdiction/Disposition Report*

In January 2021, father told the CSW that he and mother lived separately until they found out mother was pregnant in September 2020. He said he did not know whether mother had used drugs during her pregnancy and did not know why mother tested positive for opiates in September and November. Father said he had never left mother alone with the baby during the month they had been at large, and that he would insist that she move out of their home if she began using drugs again.

Father said he had smoked marijuana in high school but did not currently use drugs. He admitted that he and mother should have interacted differently with DCFS, but he believed he had done the right thing by refusing to relinquish Leeann. He said: "The [juvenile court] commissioner broke my 8th amendment right because they said they were doing it to us, the parents, as a punishment. It's cruel and unusual punishment. You can't do that to anyone in prison or anyone; that's violating my rights. I'm the one who made that decision because I was scared about losing my baby, but I'm not playing this game with them. I'm a fit enough parent, I'm not a drug addict and haven't done anything wrong in over 11 years. I wouldn't give her up because I felt she was being taken and kidnapped from me. . . . I was only doing it for my child. I'm figuring out [the] laws and the allegations and looking up everything. The four definitions of neglect don't apply to me. I've looked up the laws. It's like I'm

6

being treated as if I'm guilty until proven innocent and I wasn't given my due process."

Mother continued to refuse to tell the CSW why she was receiving methadone or to explain why she tested positive for opiates at the hospital. When asked why she had refused to surrender Leeann, she said it was because she believed she could give her baby the best care.

Father's arrest records revealed that he had been arrested multiple times for drug possession and driving under the influence, most recently in 2011; he also had been arrested in 2012, 2016, and 2020 for driving on a suspended driver's license. Mother had been arrested many times for narcotics possession, most recently in June 2019.

### E.    Jurisdictional Hearing

At the January 29, 2021 hearing, counsel for DCFS asked the court to sustain the petition as pled. Counsel noted that both mother and baby had tested positive for opiates at Leeann's birth; father continued to deny that mother had a substance abuse problem, had refused to allow the hospital to retest Leeann for drugs, would not let mother speak to DCFS in the hospital, and had absconded with the baby. Father "doesn't understand how his behavior has put this child at risk and he doesn't understand the severity of mother's substance abuse and it doesn't appear he's even trying to."

The child's counsel agreed that DCFS had met its burden with regard to both counts of the petition. Counsel asserted that it was clear mother still struggled with substance abuse and father was unwilling to acknowledge the problem. Counsel asked, however, that the disposition hearing be continued to give

mother the chance to drug test, and father the chance to gain insight and work with DCFS.

Mother's counsel joined the child's counsel's request to continue the disposition hearing, asserting that mother was working hard on her sobriety and Leeann had been well cared for by the parents. Father's counsel asked that the b-2 count of the petition be dismissed and father be deemed nonoffending, suggesting that DCFS had failed to prove by a preponderance of the evidence that father failed to protect the child from mother's drug use.

At the conclusion of argument, the court sustained both counts of the petition and declared Leeann a juvenile court dependent. The court found mother continued to use opiates during her pregnancy, as evidenced by her positive tests of September 30, November 21, and November 23. With regard to the failure-to-protect allegation, the court noted that father knew mother was on methadone, and "[n]o one is on a methadone treatment, other than to get over opiates. . . . So I think the father was being disingenuous in saying that he really didn't know she was using. . . . In addition, the failure to protect I believe is viable and true because once [father learned] the child did test positive at birth, the father started to block the ability of the hospital personnel to get a confirmatory test. Instead he started to speak for the mother, did not allow her to speak to the hospital social workers while at the hospital. He refused to consent to allow the baby to be tested again to confirm the test . . . . And he absolutely absconded with this child and obstructed the ability of the Department to do their work, that caused this court to issue a protective custody order and an arrest warrant, by absconding with the baby."

With regard to disposition, and over DCFS's objection, the court continued the hearing "to give [the] parents an opportunity to participate, cooperate and engage in services so that I can determine at a contested disposition hearing if this child should be totally removed or sent back to the parents with services in place." The court specifically advised the parents that "you need to participate in the programs and services that I initially ordered at the detention hearing. . . . So it would behoove [you] to get enrolled [and] start participating so that the court can consider whether or not I can place the child in your home."

*F.    Disposition*

In March 2021, DCFS reported father had not yet begun court-ordered classes or counseling and he had missed all of his drug tests. Although father claimed to be on a waiting list for a parenting class, he could not provide the name of the agency offering the class. He also claimed to be drug-testing, but he did not disclose the name of the clinic where he allegedly was testing, nor did he provide evidence of any negative drug tests.

Mother appeared for only one of six scheduled drug tests between January and March 2021. She recently had enrolled in an outpatient drug program.

At the March 24, 2021 disposition hearing, DCFS recommended that Leeann remain placed in foster care. Leeann's counsel joined in the request, stating that she had not seen an adequate level of participation by either parent in court-ordered programs. Counsel for the parents asked that the child be released; alternatively, father's counsel asked that father not be required to drug test.

The court ordered that Leeann remain in foster care, explaining as follows: "The court finds that the parents have

9

shown a level of dishonesty and they continue to show lack of insight in this case. The court had to . . . issue[] arrest warrants for the parents because they would not turn over this child. We ultimately were able to recover the child . . . but it appears the parents are still giving what this court considers to be bogus excuses as to why they are not testing. . . . The fact that the parents are saying, oh, they're confused, it's just another excuse that compounds . . . what the court has already seen as their lack of credibility and their non-truthtelling in the past. So I see that this type of behavior is on-going and they are not showing this court that they've gained insight. . . . And this is a baby . . . [who] has the right to a drug-free household." The court therefore found that Leeann would be at substantial danger in the parents' home, and "there are no services that can be put in place to avoid removal because the services that have already been offered to parents, they have not engaged in them to the extent and capacity the court has . . . ordered."

The court ordered mother to complete a full drug and alcohol program, weekly random drug testing, a 12-step program, a parenting class, and individual counseling. It ordered father to submit to six random drug tests, to attend a drug rehabilitation program if he missed a test or tested positive, and to complete a parenting class and individual counseling. The parents were granted weekly monitored visits with Leeann.

Father timely appealed from the jurisdictional and dispositional orders.

## DISCUSSION

Father contends: (1) there is no substantial evidence that father posed a risk of harm to Leeann; (2) substantial evidence did not support Leeann's removal from father; and (3) the

juvenile court abused its discretion by ordering father to drug test.  As we discuss, father's contentions are without merit.

## I.
## Substantial Evidence Supports the
## Jurisdictional Finding as to Father

Section 300, subdivision (b)(1), provides that a child is within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of [his or her parent] to adequately supervise or protect the child."

We review the juvenile court's jurisdictional findings for substantial evidence.  " 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings . . . , we determine if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.) " ' "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.  [Citations.]" ' " (*Ibid*.)

In the present case, substantial evidence supported the juvenile court's finding that father placed Leeann at risk of serious physical harm.  Despite learning that mother and Leeann had tested positive for opiates at Leeann's birth, father actively impeded DCFS's investigation into Leeann's prenatal drug exposure and mother's continuing drug use by refusing to disclose mother's drug history, refusing to allow DCFS to retest Leeann

11

for drug exposure, blocking DCFS's access to mother, and refusing to allow DCFS to conduct a home visit. Once mother and Leeann were released from the hospital, father lied about their whereabouts and absconded with Leeann for more than a month. In short, father thwarted DCFS's attempts to determine the kinds of drugs to which Leeann had been exposed in utero and the frequency of her exposure, which facts were relevant to the hospital's care of Leeann. Father then permitted mother, whom he knew still used illicit drugs, to care for newborn Leeann, and he impeded DCFS's repeated attempts to supervise Leeann at home to ensure her safety. Taken together, this evidence abundantly supported the juvenile court's conclusion that father put Leeann at risk of harm by failing to protect her from mother's drug use.

Father contends his conduct was reasonable because he "believed [mother] was taking care of herself" and that mother's positive test for opiates "was an error." We do not agree. Even if it were reasonable for father to believe mother was not using opiates *before* she was admitted to the hospital, that belief no longer was reasonable *after* both mother and Leeann tested positive for opiates and Leeann exhibited some signs of opiate withdrawal in the hospital, including jitters and lack of appetite. Moreover, if father truly believed the initial test might be in error, he could have best protected Leeann by permitting a second test—not by refusing to permit such a test.

Father next contends he was appropriately protective of Leeann because once he accepted that mother was continuing to use opiates, "he agreed to supervise mother and not allow Leeann to be alone with mother, and he never did." In fact, while father *said* he would protect Leeann from mother's drug use, his conduct

12

demonstrated otherwise. As we have described, father actively thwarted DCFS's attempts to ensure Leeann's safety, even going so far as to flee Los Angeles County and to refuse to disclose Leeann's whereabouts. His behavior both endangered Leeann and made it impossible for DCFS to verify father's claim that he had never allowed mother to be alone with Leeann.

Father contends finally that although he initially refused to work with DCFS, his past behavior was not probative of his future conduct because he "had calmed down and had a change of attitude by the time of the jurisdictional hearing." The record does not support this assertion. Just a week before the jurisdictional hearing, father said he did not regret his decision not to turn over Leeann to DCFS because the juvenile court commissioner had "violat[ed] [his] rights" and denied him due process. Father also refused to comply with the court's orders to drug test, enroll in a parenting class, and participate in individual counseling. In short, by the time of the jurisdiction hearing, father demonstrated neither a change in attitude nor a willingness to comply with the court's orders. The juvenile court did not err in so concluding.

## II.
### The Removal Order Was Supported by Substantial Evidence

Section 361, subdivisions (c) and (d) govern the removal of a dependent child from her parents' physical custody. As relevant to father's appellate claims, section 361, subdivision (c)(1) provides that a child shall not be taken from her parent's physical custody unless "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned

13

home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."

"A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she [is in the physical custody of] the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.] The court may consider a parent's past conduct as well as present circumstances. [Citation.]" (*In re N.M.* (2011) 197 Cal.App.4th 159, 169–170.)

Whether the conditions in the home present a risk of harm to the child is a factual issue. We therefore apply the substantial evidence test, reviewing the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, resolving all conflicts and making all reasonable inferences from the evidence in favor of upholding the juvenile court's orders. (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216.) In doing so, we take into account the clear and convincing evidence standard—that is, we consider whether the record as a whole contains substantial evidence from which a reasonable trier of fact could have found potential detriment by clear and convincing evidence. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005–1006.)

For all the reasons discussed in the prior section, substantial evidence supported the juvenile court's conclusion that Leeann would have been at risk of harm if she remained in father's physical custody. Substantial evidence also supported the juvenile court's conclusion that there were no reasonable

14

means by which Leeann's physical health could have been protected in father's custody. Father repeatedly had shown himself unwilling to accept in-home services that would have made it possible for Leeann to remain with her parents, including by refusing to allow DCFS to make a home visit, refusing to consent to a non-detained petition, lying to the juvenile court about Leeann's whereabouts, and actively concealing Leeann from DCFS. Father expressed no contrition for these actions, insisting they were justified because his own rights had been violated and he was a fit parent. Father's intransigence and unwillingness to work with DCFS was more than substantial evidence that Leeann could not have been adequately protected in father's physical custody.

We note that father remained unwilling to work with DCFS even after the juvenile court continued the disposition hearing for the express purpose of "giv[ing] the parents an opportunity to participate, cooperate and engage in services so [the court could] determine at a contested disposition hearing if this child should be totally removed or sent back to the parents with services in place." At the time the court continued the hearing, it ordered the parents to drug test, enroll in a parenting class, and engage in individual counseling, and it specifically advised them that "it would behoove the parents to get enrolled, start participating so that the court can consider whether or not I can place the child in your home." Notwithstanding this unambiguous advisement, father did not begin participating in any of the programs outlined by the court between the January and March 2021 hearings.

The existence of "reasonable means" to protect the child at home requires a parent's willingness to participate in services and to submit to DCFS supervision. (See *In re Nathan E.* (2021)

15

61 Cal.App.5th 114, 124 [parent's failure to comply with court-ordered services was substantial evidence that children could not be protected in parent's home]; *In re Cole C.* (2009) 174 Cal.App.4th 900, 918 [evidence supported court's findings that child could not be protected in parent's home where parent had not accepted any voluntary services or participated in visits with child in structured setting].)  Father repeatedly showed himself unwilling to do either.  The juvenile court therefore did not err in finding that Leeann could not safely have remained in father's custody.

## III.

## The Juvenile Court Did Not Abuse Its Discretion by Ordering Father to Drug Test

Father's final contention is that the trial court abused its discretion by ordering him to drug test because the petition did not allege that he abused drugs.  For the reasons that follow, father's contention lacks merit.

If a child is adjudged a dependent child of the juvenile court, the court may make "any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child."  (§ 362, subd. (a).)  The juvenile court has "wide latitude" in making such orders for the well-being of the child and "is not limited to the content of the sustained petition when it considers what dispositional orders would be in the best interests of the children.  [Citations.]"  (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311.)  To the contrary, the court's "broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion, permits the court to formulate disposition orders to address parental deficiencies when necessary to protect and

16

promote the child's welfare, even when that parental conduct did not give rise to the dependency proceedings. [Citation.]" (*In re K.T.* (2020) 49 Cal.App.5th 20, 25.)

In *In re Briana V., supra*, 236 Cal.App.4th 297, the Court of Appeal held that the juvenile court did not abuse its discretion by ordering the father to complete sexual abuse counseling, even though physical abuse, not sexual abuse, precipitated DCFS's involvement with the family. The appellate court noted that although there was no evidence that the father had sexually abused his daughters, he had a prior conviction for rape and was a registered sex offender. (*Id.* at pp. 300–301, 307.) Under those circumstances, the Court of Appeal said, "we cannot say that the juvenile court's order requiring father to attend sexual abuse counseling was beyond the bounds of reason." (*Id.* at p. 312.)

The court similarly concluded in *In re Christopher H.* (1996) 50 Cal.App.4th 1001. There, the juvenile court dismissed an allegation that the father's alcohol abuse had placed his child at risk of harm, but it nonetheless ordered the father to submit to drug and alcohol testing as a condition of reunification.[5] The father challenged the order, urging that the drug or alcohol testing condition was beyond the court's jurisdiction because the court found unproven the allegation that the father's alcohol-related problems negatively affected his ability to care for the child. (*Id.* at p. 1006.) The Court of Appeal disagreed and affirmed. It explained: " ' "[A] reunification plan formulated to

[5]    Although there was evidence that the father had a substance abuse problem, the court apparently found that father's substance abuse had not placed the child at risk of harm because the child had been hospitalized since his birth. (*In re Christopher H., supra*, 50 Cal.App.4th at pp. 1005–1007.)

17

correct certain parental deficiencies need not *necessarily* address other types of conduct, equally deleterious to the well-being of a child, but which had not arisen at the time the original plan was formulated." ' [Citation.] However, when the court is aware of other deficiencies that impede the parent's ability to reunify with his child, the court *may* address them in the reunification plan." (*Id*. at p. 1008, italics added.)

In the present case, although the juvenile court did not make a finding that father abused alcohol or drugs, it had a reasonable basis for suspecting that father may have been using drugs—namely, that father had been arrested multiple times for drug possession and driving under the influence, he was in a romantic relationship with a woman who continued to use illicit drugs, and he was extraordinarily secretive about his life. Under these circumstances, therefore, and in light of Leeann's very young age and inability to protect herself, the court did not abuse its discretion by ordering father to submit to six drug tests to rule out current substance abuse.

## DISPOSITION

The jurisdiction and disposition orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

LIPNER, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19